1                   UNITED STATES DISTRICT COURT

2                   SOUTHERN DISTRICT OF TEXAS

3                        HOUSTON DIVISION

4  UNITED STATES OF AMERICA        .
                                   .  Criminal Action
5  VERSUS                          .  No. H-16-CR-003
                                   .
6  OMAR FARAJ SAEED AL HARDAN,     .  Houston, Texas
                                   .  January 28, 2016:
7                                  .  4:01 p.m.
                        Defendant. .
8  . . . . . . . . . . . . . . . . .

9

                   TRANSCRIPT OF PROCEEDINGS
10
              BEFORE THE HONORABLE LYNN N. HUGHES
11
                   IN-CHAMBERS CONFERENCE
12
   APPEARANCES:
13
   FOR THE UNITED STATES OF AMERICA:
14
           Mr. Ted Imperato
15         Mr. Mark McIntyre
           Assistant United States Attorneys
16         UNITED STATES ATTORNEY'S OFFICE
           1000 Louisiana
17         Suite 2300
           Houston, Texas   77002
18         713.567.9300

19 FOR THE DEFENDANT:

20         Mr. David Adler
           Attorney at Law
21         6750 West Loop South
           Suite 120
22         Bellaire, Texas 77401
           713.666.7576
23         Fax:  713.665.7070
           davidadler1@hotmail.com
24
              PROCEEDINGS RECORDED BY STENOGRAPHIC MEANS,
25    TRANSCRIPT PRODUCED FROM COMPUTER-AIDED TRANSCRIPTION

             Gayle Dye, CSR, RDR, CRR - 713.250.5582

```
1   COURT REPORTER:

2           GAYLE L. DYE, CSR, RDR, CRR
            515 Rusk, Room 8016
3           Houston, Texas  77002
            713.250.5582
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                          PROCEEDINGS
 2                       January 28, 2016
 3        (Only Mr. Imperato present.)
 4             THE COURT:  Who is this Patel guy?
 5             MR. IMPERATO:  I've been told he's been assigned to
 6   the case and he is to appear at every meeting that we have with
 7   you from here on out.  In fact, he flew in --
 8             THE COURT:  What is his --
 9             MR. IMPERATO:  He's with the counterterrorism section.
10   He'll be reviewing all of our work.  He will be in every chamber
11   meeting that we have with you and reporting back to DC what goes
12   on.  He's their representative in our case.
13             THE COURT:  Okay.  Do you know where he's been?
14             MR. IMPERATO:  I know he came from Miami.  I think he
15   was a -- I don't know his background.  I think he was a defense
16   attorney down there for some time.
17             THE COURT:  Is he going to make an appearance in the
18   case?
19             MR. IMPERATO:  He filed his notice of appearance.
20             THE COURT:  When?
21             MR. IMPERATO:  He did it on my account.  He -- a
22   couple of weeks ago, he filed it on my account.
23             THE COURT:  Don't let those son of bitches use your
24   account.
25                       And put that in the record.
```

```
 1                    They'll do something terrible, and you'll get
 2   blamed for it.
 3                    All right, go get them.
 4                    THE LAW CLERK:  Yes, your Honor.  Just the Government
 5   attorney?
 6                    THE COURT:  Wait a minute.
 7                    MR. IMPERATO:  Judge, are we on the record?
 8                    THE COURT:  No.
 9          (Discussion off the record.)
10                    THE COURT:  Everybody.
11          (All counsel enter chambers.)
12                    THE COURT:  Mr. McIntyre.
13                    MR. MC INTYRE:  Judge, how are you?
14                    THE COURT:  Fine.
15                    MR. MC INTYRE:  Nice to see you again.
16                    THE COURT:  What is your role in this?
17                    MR. PATEL:  I'm one of the prosecutors assigned to the
18   case, sir.
19                    THE COURT:  What is your role in this?
20                    MR. PATEL:  I'm a member of the trial team from the
21   counterterrorism section.
22                    THE COURT:  You're not a member of the trial team.
23   It's been going on for a month or so and you haven't been here,
24   have you?
25                    MR. PATEL:  I have been here, sir.  I've been on this
```

04:02:29 (line 5)
04:03:54 (line 20)
04:04:05 (line 25)

1  case for about two years.

2          THE COURT:  Counsel, you made an appearance yesterday?

3          MR. IMPERATO:  No.  Mr. Patel filed his notice of

4  appearance a couple of weeks ago.

04:04:17  5          THE COURT:  And where is your tie?  Where is your

6  suit?

7          MR. PATEL:  My apologies, sir.  I had to change my

8  flight overnight.  I was overseas for work, and I just flew in

9  an hour ago, and I didn't have all my --

04:04:28  10          THE COURT:  What did you wear on the plane?

11          MR. PATEL:  I wore this, sir.  This is all I had.

12          THE COURT:  Why didn't you wear a suit?

13          MR. PATEL:  I didn't have one with me overseas.  I

14  just flew in from central Asia, sir, about an hour ago.

04:04:43  15          THE COURT:  Do you have your passport on you?

16          MR. PATEL:  Yes, sir.  It's in -- the passport is in

17  my bag which is on the --

18          THE COURT:  Let me see it.

19          MR. PATEL:  It's on the Seventh Floor.

04:04:51  20          THE COURT:  Go get it.

21      (Mr. Patel leaves chambers.)

22          MR. MC INTYRE:  Does he know the combination?

23          MR. IMPERATO:  I think so.

24          THE COURT:  To get in here?

04:05:08  25          MR. MC INTYRE:  No.  I think he left it on the Seventh

1  Floor in that little annex office of the US Attorney.  I don't

2  know if he knows the --

3          THE COURT:  The hideout.

4          MR. MC INTYRE:  The hideout.

04:05:15  5          MR. ADLER:  Judge, I got a little lower back thing

6  today.  So, if I stand up in the middle of this --

7          THE COURT:  Would you be better in that chair?

8          MR. ADLER:  No, no.

9          MR. IMPERATO:  Do you want to sit here?

04:05:24  10          MR. ADLER:  No.  I may just have to stand at some

11  point.

12          THE COURT:  You're welcome to.  And what are you

13  taking for it?

14          MR. ADLER:  Advil right now.  Trying to talk to some

04:05:34  15  clients about getting me some better stuff.

16              Just kidding.

17              You don't have to write that down.

18          MR. MC INTYRE:  For the record, you're kidding.

19          MR. ADLER:  You don't have to write that down.

04:05:44  20              But if I stand up for a second --

21          THE COURT:  I sometimes have to pace for the same

22  reason.  You're not old enough to have that problem.  McIntyre,

23  on the other hand --

24          MR. MC INTYRE:  I've already had back surgery.

04:05:57  25          THE COURT:  Really?

Gayle Dye, CSR, RDR, CRR - 713.250.5582

```
 1              MR. MC INTYRE:  Like ten years ago.
 2              MR. IMPERATO:  Really?
 3              THE COURT:  You played sports in high school?
 4              MR. MC INTYRE:  I played sports in college.  I was a
 5  four-year starter in college at linebacker.
 6              THE DEFENDANT:  You're going to pay for it.
 7              MR. MC INTYRE:  I already am.  My knees are shot, back
 8  is shot, yeah.
 9              THE COURT:  You know, my knees, I wore them out.  I
10  got to be fair.  I can't -- I can't complain about them, but I
11  did it camping and canoeing, riding and instantaneously
12  sometimes not riding horses, and all the other stuff, mountain
13  climbing, sometimes overestimating my ability.
14              MR. MC INTYRE:  All those injuries come back to haunt
15  you later, for sure.
16              THE COURT:  I call them memories.
17              MR. MC INTYRE:  Yeah.
18              THE COURT:  Get up in the morning, yeah, I remember
19  that.
20              MR. MC INTYRE:  Yeah.  I had some knee surgery, too;
21  and that knee has never actually --
22              THE COURT:  You don't need to take this down.
23          (Discussion off the record.)
24          (Mr. Patel returns to chambers.)
25              THE COURT:  How many papers have you drafted in this
```

04:06:02  (line 5)
04:06:15  (line 10)
04:06:39  (line 15)
04:06:50  (line 20)
04:08:48  (line 25)

1   case?

2           MR. PATEL:  I participated in the grand jury for the

3   indictment, sir.

4           THE COURT:  You did what?

04:08:58   5           MR. PATEL:  I participated in the grand jury for the

6   indictment.

7           THE COURT:  What did you do before the grand jury?

8           MR. PATEL:  I was with Mr. Imperato before the grand

9   jury just assisting him.

04:09:05   10           THE COURT:  He doesn't need help.  That's why they

11   assigned him McIntyre.

12           The last thing I need here, Mr. Patel, is a

13   bureaucrat who flies down here at great expense and causes

14   trouble rather than actually is a productive member of the team.

04:09:39   15           Where is your latest entry stamp?  They never do

16   them in chronological order.  Which one is your entry stamp?

17           MR. PATEL:  Sorry.  I have global entry so it's

18   electronic.  So, I don't receive an entry stamp.

19           THE COURT:  Well, where is your exit stamp?

04:09:55   20           MR. PATEL:  It's the same thing, sir.  I have global

21   entry so I don't have -- I don't receive exit stamps.  I have

22   entry stamps for --

23           THE COURT:  From which country did you leave?

24           MR. PATEL:  I left out of -- Turkey was the first

04:10:06   25   country, sir, and then Tajikistan, if you look here, sir.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1                THE COURT:  How did you -- what was your American port

2  of entry?

3                MR. PATEL:  Houston.

4                THE COURT:  So, what airline did you fly from

04:10:24   5  Tajikistan to Houston?

6                MR. PATEL:  I flew through London Heathrow and came in

7  on United, sir.

8                THE COURT:  Did you change planes in Heathrow?

9                MR. PATEL:  Yes, sir.

04:10:34  10                THE COURT:  Did you get a stamp there?

11                MR. PATEL:  No, sir.

12                THE COURT:  Unless you can articulate what you have to

13  contribute other than being a spy for a bunch of other people

14  who are not contributing to the progress of this case -- this

04:10:49  15  case is a discrete thing.  It's not part of any -- it may be

16  part of some global something, but that's -- whatever global

17  thing you're talking about will not be part of this case.

18                MR. PATEL:  I understand, sir.

19                THE COURT:  When did you get to Houston?

04:11:07  20                MR. PATEL:  The plane landed about 2:00 p.m.ish this

21  afternoon.

22                THE COURT:  If you want to be a lawyer, dress like a

23  lawyer.

24                MR. PATEL:  I will, sir.

04:11:20  25                THE COURT:  Act like a lawyer.

1                   But what is it that Washington needs for these

2       people to report, assuming -- I want to know what your

3       contribution is other than reading what happens and hearing what

4       happens and then taking -- all of which is going to be available

04:11:46   5       in print.  Why can't you supervise from a desk in Washington or

6       Tajikistan, for all I care?

7                   MR. PATEL:  Sir, the agreement between the US Attorney

8       here and Washington --

9                   THE COURT:  What?  Speak up.

04:12:00   10                   MR. PATEL:  The agreement between the US Attorney here

11       and Washington DC was that I was going to be a member of the

12       trial team.

13                   THE COURT:  That's not my agreement.  I've got to get

14       this stuff done, and I also pay taxes.  And the concept that

04:12:19   15       you're going -- you keep saying "a member of the trial team."

16       Have you ever cross-examined a witness?

17                   MR. PATEL:  Yes, sir.

18                   THE COURT:  Where?

19                   MR. PATEL:  I was a defender in Miami for nine years.

04:12:30   20                   THE COURT:  You were a public defender?

21                   MR. PATEL:  Yes, sir.

22                   THE COURT:  Are you going to take witnesses in here?

23                   MR. PATEL:  I imagine so, yes, sir.

24                   THE COURT:  I don't.  You don't seem to know anything

04:12:44   25       about trying a case.  You have two lawyers here, the Government

1  does, plus 117 over there in the Wells Fargo building.  What do

2  you supply that none of them can supply?

3          MR. PATEL:  I don't believe that I'm any better than

4  any one of them, sir.

04:13:07  5          THE COURT:  So, what is the utility to me and to the

6  people of America to have you fly down here at their expense,

7  eat at their expense, and stay at their expense when there are

8  plenty of capable people over there, in this room plus over

9  there?  You don't add a bit of value, do you?

04:13:39  10          MR. PATEL:  I mean --

11          THE COURT:  You can do nothing that McIntyre and

12  Imperato can't do equally capably, if not more capably.  You're

13  just one more non-essential employee from Washington.  And the

14  first thing you'll start doing is telling them how to do it and

04:14:05  15  telling me how to do it because you're from DC.

16          I don't need three lawyers on this case who have

17  no independent utility.  If there's some easy part, they can get

18  some new person they got over there and let them do it.  This

19  case is difficult enough without Washington just sending

04:14:35  20  unnecessary people down here to watch what they do in the

21  provinces.

22          There's a reason we have regional United States

23  attorneys.  Because they know what they're doing.  They try all

24  kinds of cases.  The idea that you need counterterrorism lawyers

04:15:02  25  -- they have civil and criminal over there, and they go back and

1   forth.  Washington and Cleveland, where they still have the

2   antitrust division, has an office resting on their laurels since

3   1907 in the Standard Oil case.  They do.

4             Now, you cannot articulate what you bring to this

04:15:40   5   where we don't already have two lawyers to do it, so you may be

6   excused.

7             MR. PATEL:  Very well, sir.

8         (Mr. Patel leaves chambers.)

9             THE COURT:  All right.  Now, remember, I told you that

04:16:00   10   I was accepting the waiver but that didn't mean we would not

11   have to do it on time.  And have you --

12             What's that case?

13             THE LAW CLERK:  Willis.

14             THE COURT:  So, are you familiar with United States

04:16:13   15   versus Willis from '92.

16             MR. IMPERATO:  I'm not.

17             THE COURT:  It says you can waive your constitutional

18   right to a speedy trial but you can't waive the act which seems

19   bizarre.

04:16:32   20             MR. MC INTYRE:  Uh-huh.

21             THE COURT:  Shouldn't it be the other way around, you

22   can waive the statute but not the constitution?

23             MR. MC INTYRE:  I would think so.

24             THE COURT:  I've gotten this far without stumbling

04:16:43   25   across this case, although I was here before it was.  You ought

1  to check on that.

2          MR. IMPERATO:  Yes, sir.

3          THE COURT:  It makes no sense to me but so much of

4  what happens --

04:16:54  5          MR. ADLER:  It's a Fifth Circuit case?

6          THE COURT:  Yes.  There's one from the Second Circuit

7  and --

8              Go make them a copy of just the cover page.

9          MR. MC INTYRE:  They're saying you can't waive the

04:17:10  10  statutory speedy trial?

11          THE COURT:  Without doing the stuff on --

12          MR. MC INTYRE:  Oh, the other way is -- yeah.

13          THE COURT:  No.  That's in the statute.

14          MR. MC INTYRE:  Right.

04:17:20  15          THE COURT:  But you can't just say, no, we're not

16  going to do that even though he agrees.  So, he can plead guilty

17  to the offense.  You know, you can have a plea agreement but you

18  can't have a speedy trial agreement.  It seems peculiar.  So,

19  check on that because I don't want to mess this up.

04:17:37  20          MR. MC INTYRE:  Okay.  Yes, your Honor.

21          THE COURT:  All right.  Who supplied you with that 1.3

22  terabyte figure?

23          MR. IMPERATO:  I called the FBI because I wanted to

24  know how much discovery they had and I asked for the specific

04:17:51  25  amount, and they said 1.3 terabytes.  And they said that -- they

1   gave me the figure that one terabyte equals 250 million --

2          THE COURT:  That's not my problem.  Nobody at the FBI

3   has read all that, have they?

4          MR. IMPERATO:  They're still downloading it, Judge.

04:18:05   5          THE COURT:  No.

6          MR. IMPERATO:  Oh, they have not.

7          THE COURT:  It's unread --

8          MR. IMPERATO:  Yes.

9          THE COURT:  -- supposedly --

04:18:12   10          MR. ADLER:  I'm sorry.  That's all from the computers

11   at his apartment?

12          THE COURT:  No.  I mean, it was -- his apartment was a

13   rinky-dink thing.

14          MR. IMPERATO:  That's the information that they

04:18:22   15   gathered.  So, there were some disks found.

16          MR. ADLER:  Oh, okay.  But still, that seems like a

17   lot.

18          THE COURT:  No.  I mean, I have a one terabyte drive.

19   I've never used more than ten percent of it, and it's got all

04:18:34   20   the family pictures on it.  And despite the way they look, I've

21   got a lot of pictures taken of them.

22          And so, my point is counterterrorism DC hasn't

23   looked at 1.3 terabytes.  I mean, that's got to be all of the

24   data about the guy in Sacramento or wherever and, you know,

04:18:58   25   whatever data searches they've done on his brothers and all that

1  stuff.

2           This case cannot be tried with a terabyte of

3  data.  It hasn't been prepared.  I'm not finding fault with

4  you-all.  They told you a very modest selection of that data.

04:19:19  5           MR. IMPERATO:  And I wasn't more specific, Judge.  I

6  should have been.

7           THE COURT:  No.

8           MR. IMPERATO:  I didn't even know what a terabyte was

9  until they told me.

04:19:26  10           THE COURT:  How old are your children?

11           MR. IMPERATO:  16, 16, 13, 13, and 12.

12           THE COURT:  Ask the 12 year old to explain computers

13  to you.

14           MR. ADLER:  There's no such thing as a

04:19:39  15  counter-terabyte, by the way, just to let you know.

16           THE COURT:  That's pretty funny.  We'll copyright that

17  for you.

18           MR. ADLER:  That may be my only victory in the case,

19  Judge.

04:20:02  20           THE COURT:  Give mine to --

21           MR. IMPERATO:  Thank you.

22           THE COURT:  She knows where it is.

23           So, my thought is you have an FBI agent assigned

24  to this case who persuaded you to take it to the grand jury.

04:20:17  25           MR. IMPERATO:  Yes.

 1          THE COURT:  You ask him how many officers' reports he

 2   read in preparation.  And he, obviously, has them or has access

 3   to them easily.

 4          MR. IMPERATO:  Yes.

04:20:34  5          THE COURT:  Let's start with those.  Almost nobody

 6   reads the 800,000 pages.  They go through them right quickly,

 7   get what they think is important, if anything.  I mean, you

 8   know, I deal with wiretaps all the time.  And you know,

 9   unfortunately, they want to leave out the part I like about how

04:20:54 10   they do their "cabrito" and things like -- and what -- what

11   Jose's wife is doing with Orlando.  It's all in there.  They

12   want me to read about drugs.  That's not very interesting.

13          So, we're going to take this by having your

14   agents tell you what they think the data that they have that

04:21:31 15   somebody has investigated his second cousin in Cleveland and has

16   done a report about his background.  It's almost entirely true

17   that we can rely on his report about what he found and didn't

18   find.  And the only person who might have some question about

19   what he found that you want to use is Mr. Adler.  He doesn't

04:21:58 20   need to see all the underlying data until he raises some point

21   about it.

22          Now, there may be other data he wants to see raw.

23   He ought to be able to do that.  But delivering to you or to him

24   1.3 terabytes of data -- my Greek is not good.  It's a billion?

04:22:24 25   Because a megabyte is a million bytes, isn't it?

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1          MR. ADLER:  So, terabyte -- I don't even know.

2          MR. MC INTYRE:  A trillion maybe.

3          THE COURT:  Something like that anyway.  Don't you

4    speak Greek?

04:22:40  5          MR. MC INTYRE:  No.  My kids go to a Greek school,

6    though.

7          THE COURT:  I thought McIntyre was a Greek name.

8          MR. MC INTYRE:  Greek-Irish.

9          THE COURT:  I have an English name.  There's no chance

04:22:52  10   I speak good English.

11              You know, they have a plan.  If you ask the agent

12   tell me how you're going to prove that this man did the elements

13   of this crime, he could tell you in about 30 seconds.  And say:

14   Get me the reports that show that connection, that connection,

04:23:09  15   that connection, this connection, this purchase, that purchase.

16   We already know the guns and the parts that were in his

17   apartment.

18              And so, I don't know what else there is.  But I

19   guarantee you, from what I know now, I know there's not a

04:23:28  20   terabyte.  That guy probably hadn't done a terabyte of activity

21   in his life.  Does that make sense?

22          MR. IMPERATO:  Yeah, it does, Judge.  It does.

23          THE COURT:  And I'll do an order that he's to get --

24   you're to gather the officer's reports for all, what do I want

04:23:47  25   to call it, clusters of data.  How about that?

 1            MR. MC INTYRE:  Okay.

 2            THE COURT:  I don't want to say surveillance tapes or

 3   something like that.  And once you've gotten the ones that your

 4   case agent has identified is the ones that will be 87 percent of

04:24:09   5   the case, you'll stop and let him look at them.

 6            MR. IMPERATO:  I think we're prepared to do that,

 7   Judge.  I'm going to get all the reports.  And David and I have

 8   worked many cases together.  I'm going to give him the reports,

 9   the unclassified.  I think where we get into the issues is when

04:24:25  10   -- with the classified information that they have.  But we got a

11   lot of it declassified.

12            THE COURT:  FBI knew that they were bringing this case

13   how long ago?

14            MR. IMPERATO:  A couple -- well, a couple of months.

04:24:39  15   It's been months.

16            THE COURT:  And so, we cannot wait --

17            MR. IMPERATO:  I agree.

18            THE COURT:  -- on, again, one of those people who fly

19   in as a document control officer or whatever they are and insult

04:24:54  20   everybody.  That last guy, he assaulted everybody in the

21   building, missed appointments.  Insane.  We can't wait on those

22   people.  They need to do -- they were home watching TV because

23   it snowed last week.

24            MR. IMPERATO:  Mark and I, we talked about it; and we

04:25:13  25   -- we can try a lot of this case without the classified

1  information which is -- I think David is going to want --

2          MR. MC INTYRE:  We can, yeah.  I mean --

3          THE COURT:  Wait a minute.  Of course -- first, you're

4  going to try it without classified information.

04:25:29  5          MR. MC INTYRE:  Yes.

6          THE COURT:  Because if it's not declassified, I'm

7  going to admit it to the jury.

8          MR. MC INTYRE:  Right.

9          THE COURT:  That's all there is to it.  And I read

04:25:35  10  that article from a student at Duke about -- he keeps thinking

11  I'm all powerful once you bring the case.  I like the tone of

12  that.  I didn't believe him.  But it was after all a Law Review

13  article.

14          And then, we have -- the problem is Adler is

04:25:58  15  going to tell you the things he wants you to look at for the

16  defense that may not be in the FBI's favorite 12, and so you got

17  to get those, and he can see them.

18          Did you get a clearance this time or is yours

19  expired?

04:26:21  20          MR. ADLER:  They're working on it.  They sent me some

21  forms to fill out today.

22          THE COURT:  One more set of forms.

23          MR. ADLER:  Some kind of a tax waiver form I'd never

24  seen before.

04:26:28  25          THE COURT:  Oh, so they can get all your tax records?

Gayle Dye, CSR, RDR, CRR - 713.250.5582

```
 1              MR. ADLER:  I got excited.  I thought maybe it meant I
 2    could not have to pay taxes anymore.
 3              THE COURT:  That's right.
 4              MR. MC INTYRE:  A waiver of taxes.
 5              MR. ADLER:  A form mislabeled.
 6              MR. MC INTYRE:  Where do I sign?
 7              THE COURT:  What we need to do then is the ones that
 8    aren't classified, get them to him and -- but if through any
 9    source you are suspicious that there may be some exculpatory,
10    tell him as soon as you can.
11              MR. ADLER:  Right.
12              THE COURT:  And then, get it to him as soon as you
13    can.  I mean, I can trust you.
14              MR. IMPERATO:  Yes, Judge.
15              MR. ADLER:  And the ones that they can get to me,
16    obviously, then I can start talking to my client about.
17              THE COURT:  Yes.  Or whoever.  You don't have to tell
18    him where you get your suspicions.  But you know, I think I
19    pointed out last time I tried a spy case --
20              MR. IMPERATO:  Right.
21              THE COURT:  -- in this building, which is cozy, and
22    then I had another high security.  But in that case, they didn't
23    get my law clerk's clearance through until the last day of the
24    trial and she'd seen everything.  You know, they get their
25    assistants screened and get the clearances issued real quickly.
```

04:26:36
04:26:59
04:27:08
04:27:29
04:27:50

 1  But it just -- of course, I have to admit mine took six

 2  months --

 3              MR. MC INTYRE:  To become a judge?

 4              THE COURT:  -- from nomination to confirmation, much

 5  of which nothing was happening; and you know, it was done by two

 6  active FBI agents; and they got it done right away.

 7                  Then, they sat on it for awhile.  Not because of

 8  me.  Senator Byrd of West Virginia had some concession he wanted

 9  on -- I think it was an agricultural bill.  So, he bumped the

10  consent calendar every morning.  You know, there was an

11  ambassador, couple of admirals, me, and maybe another judge.

12  Nobody said anything bad about us at all.  But every morning he

13  would object to the consent calendar until he got some more

14  tobacco subsidies or something.  I've forgotten all about it.

15              MR. MC INTYRE:  I clerked for Judge Harold DeMoss in

16  this courtroom when I got out of law school.  We were supposed

17  to start, like, in September; and it didn't happen until

18  December because of the same thing.  Somebody wanted some little

19  thing somewhere.  So, they just kept pushing him back and back

20  and back, and he's sitting around and --

21              THE COURT:  It's my career, and it's an important job

22  that needs to be filled.

23              MR. MC INTYRE:  Right.

24              THE COURT:  But to people in Washington, it's just one

25  more chip that you can trade for something.

```
 1              MR. MC INTYRE:  Yeah.  That's exactly what happened.
 2              THE COURT:  So, I don't want to do what I would
 3    consider to be an insubstantial extension.  I don't think the
 4    question of law is very complex.  It's a straightforward
 5    statute.  There is a lot of data.  But the data you use -- I
 6    mean, when do you think you'll be ready for trial?
 7              MR. MC INTYRE:  We were talking about that.  I mean,
 8    if David doesn't want to look at the classified information and
 9    he doesn't want to challenge the collection through FISA, we can
10    be ready very, very quickly because, like, the stuff that's
11    declassified, that's not classified, that's relevant is a very
12    small amount of information.  It's not a complicated case, in my
13    opinion.  But there's a whole mass of data that is classified
14    that's not really --
15              THE COURT:  But they classify everything.
16              MR. MC INTYRE:  Well, I mean, everything that comes
17    off, yeah, it's classified, that's right, so --
18              THE COURT:  And nobody ever bothers to do anything
19    with it until -- but in this case, they're doing something with
20    it.
21              MR. MC INTYRE:  Right.
22              THE COURT:  And of course, if they don't screen it
23    very carefully -- somebody looked at it, didn't they?  I mean,
24    don't they --
25              MR. MC INTYRE:  Right.
```

1          MR. IMPERATO:  Yeah.

2          THE COURT:  They have wiretaps.  Somebody has to read

3 them, don't they?

4          MR. MC INTYRE:  Right.

04:30:44   5          THE COURT:  And they should tag it as rubbish.

6          MR. MC INTYRE:  And I think that -- I think they do.

7 It's just a matter sometimes that defense counsel wants to --

8 you know, they don't want to take, I guess, the FBI's word or

9 whatever on that.  So, it's -- so, I don't know what David's

04:31:00  10 position is on those --

11          THE COURT:  Be an easy job if he just took the

12 Government's word for it.

13          MR. MC INTYRE:  Make it easy for me, that's for sure.

14          MR. ADLER:  Yeah, understood.  I can't really comment

04:31:10  15 because I haven't even seen the unclassified yet so --

16          MR. MC INTYRE:  Right.

17          THE COURT:  You know, you can -- some of it's

18 classified that you think you might be interested in but you can

19 redact much stuff.

04:31:23  20          MR. MC INTYRE:  And we're having the agents -- and

21 they've done a lot of it.  They haven't done it all.  They're

22 doing a Brady review for all the classified information.  So,

23 anything that's Brady and helpful to him would be declassified

24 and given over to him.

04:31:36  25          THE COURT:  If it's classified and it's helpful to

1    him, it's admissible.

2            MR. MC INTYRE:  No, exactly.  We're going to

3    declassify that and give it to Mr. Adler.

4            THE COURT:  So, the other case was our Wilson case.

04:31:47    5            MR. ADLER:  I don't remember that one.

6            THE COURT:  So, I'm reading this notebook; and in that

7    case, the docket control officer said he would come down and

8    unlock the safe.  And I told him if he ever came back to wear

9    casual clothes so he could wash my car, that would be something

04:32:06    10   useful, and give me the combination and get lost.

11           But -- so, I'm on page 8 and I turn it over and

12   this page is all (indicating); and there's -- at the bottom,

13   there's a little black bar.  And then, this one, at the bottom

14   of it, there's a little typed bar that says page 10.  And I'm

04:32:31    15   just guessing your average soviet spy could figure out that that

16   had been page 9.  What kind of fruitcakes are doing this stuff?

17           MR. MC INTYRE:  And their stack is bigger than your

18   stack and you're supposed to have everything, right?  It's a

19   little troubling.

04:32:52    20           THE COURT:  Wipe out page 9.  Even the staple holes,

21   that's confidential, too.

22           And how does he challenge CIPA or FISA or any of

23   these other wholly unnecessary agencies?

24           MR. MC INTYRE:  Well, if he wanted the -- you know,

04:33:13    25   FISA is sort of the wiretap of these classified cases.  So, he

1   would have to, I guess, file a motion to claim that the -- there

2   wasn't probable cause to prove that their agent had foreign

3   power and, therefore, the FISA was issued unlawfully.  So, he

4   would have to file a motion to challenge that FISA collection.

04:33:37  5        THE COURT:  Well, can't you give him, to start with,

6   the affidavit that they took to the FISA Court?

7        MR. MC INTYRE:  No, we can't.

8        THE COURT:  What if I order it produced?

9        MR. MC INTYRE:  Well --

04:33:51  10        THE COURT:  Because that's the question:  What did

11   they tell the rubber stamps on the FISA Court that they wanted?

12        MR. MC INTYRE:  It's -- I know they've never been

13   turned over before in any other case.

14        MR. IMPERATO:  We looked it up because we had the same

04:34:06  15   question, and I think we have a case -- we have it back at the

16   office -- where they wouldn't allow the FISA application to be

17   turned over.

18        THE COURT:  If there's nothing in it to be

19   compromised, why not?

04:34:18  20        MR. IMPERATO:  I think what happens is David files

21   something saying that he's contesting the FISA and then you

22   review it and you determine, and then you let him know whether

23   it was properly --

24        THE COURT:  Are you going to do that?

04:34:34  25        MR. ADLER:  Am I going to do that?


Gayle Dye, CSR, RDR, CRR - 713.250.5582

1          THE COURT:  Uh-huh.

2          MR. ADLER:  Again, the only thing I've seen is --

3          THE COURT:  You can't see anything until you -- how do

4    you file a motion contesting it if all you know is what they'll

04:34:46   5    tell you?

6          MR. IMPERATO:  Procedurally, I think that's how it

7    would happen.

8          MR. MC INTYRE:  Yeah.  I did one of these hearings in

9    Detroit.  Anyway, I did a detail.  Anyway, I did one in Detroit.

04:34:58   10   And what happens is you have an ex parte in camera hearing with

11   the judge where he looks at it.  It's like a search warrant or

12   Title 3.  You read it as a judge and go is it -- you know, is it

13   sufficient or not sufficient?

14         MR. ADLER:  But if -- and I'm not trying to work

04:35:12   15   against my client here.  But if you're not even going to use

16   that stuff in court, what's the point of me trying to suppress

17   it if it's not even going to come in?

18         MR. MC INTYRE:  Well, I mean, we're going to use some

19   of the stuff that we collected pursuant to FISA.  We're not

04:35:24   20   going to use anything in the FISA.  But there's --

21         MR. ADLER:  Then, I'll just have to look and see.

22         MR. MC INTYRE:  But you know, all the stuff we plan to

23   use has been declassified.  So, you'll get a copy of that to

24   look at.

04:35:33   25         MR. IMPERATO:  We talked about it.

1          MR. ADLER:  Oh, okay.

2          THE COURT:  So, if you're declassifying the FISA

3     information, you can't declassify the application?

4          MR. IMPERATO:  Yes, that's my understanding.  He can

04:35:45  5     see what we got, he just can't see how we got it.

6                   Is that right?

7          MR. MC INTYRE:  He can't see --

8          THE COURT:  The application should describe what you

9     know.

04:35:57 10          MR. MC INTYRE:  Right.

11          THE COURT:  Like a regular search warrant.  You say we

12     found out this, this, this, and this about this guy so we would

13     like to do this.  And if the "this" says a Model 76 transducer

14     something, then you can black that out.  He doesn't care.  What

04:36:13 15     he cares is the authority -- factual authority that was

16     submitted to the FISA Court.  Have they ever denied one?

17          MR. MC INTYRE:  I don't know.

18          THE COURT:  If they went for, like, 14 years and never

19     denied one, there's something wrong with it.

04:36:30 20          MR. MC INTYRE:  Must be really good writers up there.

21          THE COURT:  Huh?

22          MR. MC INTYRE:  Must be really good writers writing

23     these FISA --

24          THE COURT:  Right.  I've also read enough search

04:36:42 25     warrant applications to have some idea what they look like.


                 Gayle Dye, CSR, RDR, CRR - 713.250.5582

1          MR. MC INTYRE:  But I think the way it's, you know,

2    traditionally been handled is you get to eyeball it and you

3    determine which is probable cause.

4          THE COURT:  That's fine with me.  He probably doesn't

04:36:52   5    like that idea.

6          MR. MC INTYRE:  I know.

7          MR. ADLER:  I don't have a problem with that.

8          THE COURT:  It's just like attack on a search warrant

9    except the defense lawyer can't be there.

04:37:07   10         All right.  Well, you think about that; and if

11   you want to do it, let me know -- let me file a motion.

12         MR. ADLER:  From what I've heard and seen so far, it

13   seems like a lot of this is just going to be discussions between

14   my client and the informant here in town.  So, a lot of that, I

04:37:25   15   think, would not be classified information.

16         MR. IMPERATO:  That has been declassified.

17         MR. ADLER:  If my client participates in the

18   conversation --

19         MR. IMPERATO:  Those have been declassified.

04:37:32   20         MR. ADLER:  So, I think that's going to be the meat

21   that I would like --

22         MR. MC INTYRE:  Yeah.  I mean, the bulk of everything

23   has been declassified so we'll get you all that.

24         MR. IMPERATO:  We'll get you all that.  I got you

04:37:41   25   those conversations.  I still have a disk.



1          MR. ADLER:  Yeah.



1 ///////////////////////////////////////////
2 /////////////////////////////////
3 /////////////////////////////////////////////
4 //////////////////////////////////////////////////
04:39:48  5 ///////////////////////////////////////////////////
6 //////////////////////////////////////////////////
7 ///////////////.

8          MR. IMPERATO:  I mean, enough that we can -- as far as

9 items, I can't -- I mean, we've got Facebook conversations.

04:40:09  10 We've got the conversations with the --

11          THE COURT:  All this stuff you know you may use, I get

12 to scrutinize that, too.

13          MR. MC INTYRE:  Oh, yeah.

14          THE COURT:  Even the background stuff that you're not

04:40:23  15 going to use because Al Hardan may have an explanation about

16 some collateral thing that you don't think is important that he

17 could tell Mr. Adler who could then explain why that

18 decriminalizes or makes unsuspicious whatever it was he was

19 doing later in another thing.

04:40:49  20          MR. IMPERATO:  It's a lot of information because he

21 was on his computer a lot looking at stuff.  So, there's a lot

22 of stuff online.  There's a lot of eBay orders.

23          MR. ADLER:  Can you tell me at this point about how

24 many separate meetings the two of them had together?  Are we

04:41:04  25 talking about six or talking about sixty?

1          MR. IMPERATO:  No, no.  He testified at the hearing it

2      was 17.  It was 17 -- you mean the confidential human source?

3      Yeah, 17 meetings.  I think it was 17.

4          THE COURT:  But that's a manageable universe.

04:41:15    5          MR. ADLER:  Yeah.

6          MR IMPERATO:  They were long meetings but --

7          MR. ADLER:  But they were all recorded, I would

8      imagine, and transcribed?

9          MR. IMPERATO:  14 of the 17.

04:41:21   10          MR. MC INTYRE:  Basically, 95 percent of the case we

11      can give you now because that's --

12          MR. IMPERATO:  Yes.

13          THE COURT:  What?

14          MR. MC INTYRE:  I said 95 percent of the case we can

04:41:27   15      give him right now.  There's not a whole bunch of stuff that's

16      classified that we're going to later declassify.

17          THE COURT:  That's what I said.  There's not one

18      terabyte of anything you need or I need or Adler needs.

19          MR. MC INTYRE:  Right.

04:41:42   20          THE COURT:  But that's the Government.  They give you

21      the most scariest statistic.

22          MR. IMPERATO:  Right.

23          THE COURT:  And it's the wrong data.

24          MR. IMPERATO:  Judge, that was my mistake then because

04:41:53   25      I wasn't clear.  I wasn't clear.

1          THE COURT:  No.  When you're fed bullshit,

2    sometimes --

3          MR. ADLER:  You're not from Montgomery County, are

4    you?

04:42:06   5          MR. IMPERATO:  No.

6          THE COURT:  But I hope -- I hope this is secure

7    because the headline will be US Attorney Imperato hates people

8    in rural areas.

9          MR. IMPERATO:  No.

04:42:19  10          MR. MC INTYRE:  Rural America, worst enemy, Ted

11   Imperato.

12          THE COURT:  What was it somebody said a couple of

13   years ago?  They're obsessed with -- I think it was the

14   president -- with their guns, Bibles --

04:42:33  15          MR. ADLER:  Bibles.

16          MR. IMPERATO:  Bibles.

17          THE COURT:  And what was the third one?

18          MR. IMPERATO:  They're clinking to their guns and

19   their Bibles.

04:42:38  20          MR. MC INTRYE:  And religion, too.

21          THE COURT:  Bibles, guns --

22          MR. IMPERATO:  I thought it was just the two, their

23   guns and their Bibles.

24          THE COURT:  All right.  So, how long do we have left

04:42:56  25   before we have to try this case, 65 days or so?

1          MR. IMPERATO:  Motions are due Tuesday, so --

2          MR. ADLER:  70 days would be -- yeah, I'll probably

3   ask for an extension of the motion deadline just so I can --

4   maybe I don't have to file any, depending on what they can give

04:43:17  5   me.

6          THE COURT:  Well, you're not due the same day, are

7   you?  Yours aren't due the same day as theirs.  I don't know.

8          MR. IMPERATO:  I don't have the order.

9          THE COURT:  Here, I have it.  Well, let's just move

04:43:43  10  yours back a week.  So, February 9th?

11         MR. ADLER:  Okay.

12         MR. IMPERATO:  Then, when do we have to have our

13  motions filed?

14         THE COURT:  The 2nd.

04:43:52  15  MR. IMPERATO:  The 2nd?

16         THE COURT:  Is that okay?

17         MR. IMPERATO:  I think we have to file --

18         THE COURT:  I don't want to be nice to you, but I

19  don't want to be cruel.  Is that 2(r)73(b)(g)?

04:44:05  20  MR. IMPERATO:  Tuesday?

21         THE COURT:  That is the 2nd, isn't it?

22         MR. IMPERATO:  We have to file the CIPA, Section 2.

23         MR. MC INTYRE:  That's pretty much --

24         THE COURT:  Tuesday is the 2nd.

04:44:22  25  MR. IMPERATO:  Yes.


              Gayle Dye, CSR, RDR, CRR - 713.250.5582

         1              THE COURT:  That's three business days from now.

         2              MR. MC INTYRE:  Friday, the 5th, is that too -- out of

         3    the question?

         4              THE COURT:  Friday, the 5th.

04:44:31 5              MR. MC INTYRE:  Right.  That will give us plenty of

         6    time.

         7              THE COURT:  And then, we'll move you to the 12th,

         8    Mr. Adler?

         9              MR. ADLER:  I'm sorry?  Move it to the 12th?  That

04:44:38 10   will be fine.

        11              As long as I can see -- you know, come down and

        12    see what you guys have between now and then.

        13              MR. IMPERATO:  Definitely.

        14              MR. ADLER:  The 12th is fine.

04:44:50 15             THE COURT:  And then, we'll get together afterward.

        16              MR. IMPERATO:  Okay.

        17              THE COURT:  But look at that case.

        18              MR. IMPERATO:  I will.

        19              THE COURT:  You don't have any young people over

04:45:03 20   there, do you?

        21              MR. IMPERATO:  In our office?

        22              THE COURT:  Uh-huh.

        23              MR. MC INTYRE:  We just got a new intern that's in law

        24    school.  She's got a computer.  So, I can just have her look it

04:45:12 25   up.


                      Gayle Dye, CSR, RDR, CRR - 713.250.5582

1            THE COURT:  Well, the problem is that's going to be

2   really complex that she has no idea what --

3            MR. MC INTYRE:  Yeah.  I can look into it, your Honor.

4            THE COURT:  And just, like I say, it seems strange but

04:45:24   5   I can do it.

6            MR. IMPERATO:  I have that case.  You're talking about

7   the case from FISA?

8            MR. MC INTYRE:  No.  He's talking about Wilson, the

9   speedy trial case.

04:45:33   10            THE COURT:  That one.

11            MR. IMPERATO:  Oh, this.

12            THE COURT:  I'll take your word on it.  I can do it

13   and leave him out.

14            MR. IMPERATO:  Okay.

04:45:39   15            THE COURT:  Because he didn't speak up so it must be

16   pretty close to right.  Maybe you should read this kid's --

17            MR. MC INTYRE:  He's got his tax waiver signed, so

18   he's good.

19            MR. ADLER:  Yeah.

04:45:51   20            MR. MC INTYRE:  He's not paying any federal taxes.

21            THE COURT:  And do you have a new document control

22   officer?

23            MR. IMPERATO:  One has been assigned.

24            MR. MC INTYRE:  Yeah, we do.

04:46:01   25            MR. IMPERATO:  We don't have a name on it yet.

```
 1              MR. MC INTYRE:  The one that you didn't like isn't
 2    working there anymore.  I don't know where he went.  But Brandon
 3    Forester (phonetic spelling) was his name.  And they've assigned
 4    -- they've got a new guy from this area, Scooter --
 5              MR. IMPERATO:  We've asked to meet him.
 6              MR. MC INTYRE:  Scooter somebody.
 7              MR. IMPERATO:  We've asked to meet him.  We have a
 8    request to meet him, for him to come down.  We were going to
 9    talk to him, bring him over, set up a meeting with you to meet
10    with you and your staff to introduce him to you and then let him
11    know what not to do.
12              THE COURT:  That's when I'll tell him not to come
13    back.
14              MR. MC INTYRE:  I mean, like, if David is not
15    challenging the FISA, he's not wanting to look at the classified
16    information --
17              MR. IMPERATO:  Then, we may not need him.
18              THE COURT:  But the classified -- I don't need him.
19    If you tell me that you intend to use the information to
20    prosecute Al Hardan, I'll look at it, see whether it's relevant.
21    If it's relevant and if it's exculpatory -- remember, we're
22    doing all the exculpatory stuff -- then I'll rule on its
23    admissibility and it's declassified.
24                   The Government -- I'm not talking about you-all.
25    But the rest of those people can't not do their jobs when they
```

1  need to be done or very busy.

2          MR. IMPERATO:  That's true.

3          THE COURT:  I just flew in from the Middle East.

4          MR. MC INTYRE:  Well, I mean, we do plan to have all

04:47:19  5  the Brady information that's helpful to him declassified and

6  everything we intend to use.

7          THE COURT:  All the stuff that really should be Brady

8  that they don't call Brady.

9          MR. MC INTYRE:  Well, that's another issue, yeah.

04:47:30  10          THE COURT:  Seriously --

11          MR. MC INTYRE:  Right.

12          THE COURT:  -- Justice does not want me to dismiss

13  this case for violation of the Brady Act -- or the Brady case.

14          MR. MC INTYRE:  That is true.

04:47:42  15          THE COURT:  You know --

16          MR. MC INTYRE:  Right.

17          THE COURT:  -- I'm not hanging anybody and then having

18  to undo it later because Main Justice didn't give you the

19  information.

04:47:59  20          MR. ADLER:  I believe his name is Scooter Slade

21  (phonetic spelling).

22          MR. IMPERATO:  What's his name?

23          MR. ADLER:  Scooter Slade.

24          MR. IMPERATO:  Okay.

04:48:01  25          MR. MC INTYRE:  I haven't met him so I don't know what

1   -- I don't know what he's like.  Have you met him?

2               MR. ADLER:  No.  But his name gives me confidence.

3               THE COURT:  I'm happy to meet with him; but most of

4   all, I want them -- I just want permission to share the data

04:48:11   5   with my staff, the two law clerks, the case -- the case manager

6   doesn't do anything but stamp "sealed" on stuff, and my

7   secretary.  She's completed the application and they called her

8   and told her "You're clear but you don't need it."  And they

9   don't decide whom I need to have.  So, if they don't, I will.

04:48:38   10              MR. MC INTYRE:  So, would that -- do you think that

11  would be helpful if we just brought him down to talk to you?

12              THE COURT:  I think so.  Because if he's going to be

13  saying that he can't do that kind of stuff.  But then, I guess

14  -- did you try to talk to the clearance people and tell them to

04:48:53   15  issue the thing because I'm not happy with them deciding when --

16  how the hell do they know when a Court needs somebody to look at

17  something and help them with it?

18              MR. MC INTYRE:  Right.  Yeah.  I don't -- I don't

19  know.  I mean, I'm going to make a call to this Scooter guy and

04:49:12   20  tell him -- I mean, we did relay to our office that you had some

21  issues with this one guy and we weren't going to use the

22  previous guy, and there's a new -- but I don't know -- I can't

23  vouch for the new guy.

24              THE COURT:  You would have had issues with him, too,

04:49:24   25  believe me.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1          MR. IMPERATO:  We would have.

2          THE COURT:  He was no more reliable than that one

3  trip.

4          MR. MC INTYRE:  Yeah.

04:49:29  5          THE COURT:  I mean, talk about somebody -- I just hope

6  he's never armed because he was so eaten up with macho.  He was

7  security.  A Molotov that lost his way.

8              All right.  Well, when he comes, I want to meet

9  with him.

04:49:47  10          MR. MC INTYRE:  Okay.

11          MR. IMPERATO:  Yes, sir.

12          THE COURT:  But you might tell him when he comes have

13  a time schedule for clearing the people I designate.  They've

14  already had, you know, no pending felony warrants before they

04:50:00  15  can start here which limits my range of clerks.  The interesting

16  ones I can't have.  I almost hired a foreigner, and I had no

17  clue that I couldn't hire a foreigner.  I mean, he's here on a

18  permanent Visa and stuff and they said --

19              Don't put this on the record.

04:50:23  20      (Discussion off the record.)

21          THE COURT:  All right.  Anything else?

22          MR. MC INTYRE:  We're good.

23          MR. IMPERATO:  No, Judge.  Thank you.

24          THE COURT:  If you-all reach a glitch about anything,

04:51:04  25  talk to each other and then let me know and we can get together.

1          MR. MC INTYRE:  I mean, I think it's going to be good.

2     David and I and Ted -- I mean, we've all worked cases for years

3     and years and years.  Hopefully, it will be good.

4          THE COURT:  You know, I've known him two years.  And

04:51:20   5     despite his service in the Central Intelligence Agency, they

6     said he had to fly up there and look at stuff; and it was

7     nothing but make work so they felt important.

8               And I probably told you this.  But nine months

9     into the case and all this talk about all the steps they have to

04:51:40  10     go through and we get a letter from the lawyer in Washington

11     saying, We found nine boxes -- or the painters found nine boxes

12     of Wilson material when they were cleaning up a room in Main

13     Justice to paint.  I mean, it's critically important; but the

14     way they do it, it's a parody.

04:52:10  15          MR. ADLER:  Wasn't there some issue with the safe

16     here?  And they left the combo on the factory -- left the

17     original --

18          THE COURT:  The factory -- a safe that had been used

19     over 20 years in, at least, four cases from the stickers on it

04:52:22  20     still had the combination at factory default.  And most soviet

21     spies would know the factory default.  Your ordinary street

22     burglary would know the factory default.  Yep.  But we never

23     know where page 9 went.

24          MR. ADLER:  Thank you, Judge.

04:52:36  25          MR. IMPERATO:  Thank you, Judge.

```
 1              MR. MC INTYRE:  Thank you, your Honor.
 2                   Off the record.
 3        (Discussion off the record.)
 4        (Proceedings concluded at 4:52 p.m.)
 5
 6
 7
 8
 9
10                 C E R T I F I C A T E
11
12        I certify that the foregoing is a correct transcript
13   from the record of proceedings in the above-entitled matter, to
14   the best of my ability.
15
16   By: /s/Gayle L. Dye_____          02-09-2016_____
17             Gayle L. Dye, CSR, RDR, CRR        Date
18
19
20
21
22
23
24
25
```